David R. BROWER, et al., Plaintiffs,

v.

William DALEY, Secretary of Commerce, et al., Defendants.

No. C99–3892 TEH.

United States District Court, N.D. California.

April 11, 2000.

---

Ariela Freed, Joshua R. Floum, Legal Strategies Group, Emeryville, CA, for Plaintiffs.

Ignacia P. Moreno, U.S. Dept. of Justice, Environment and Natural Resources Div., Washington, DC Robert S. Mueller, Charles Schockey, U.S. Attorney's Office, Criminal Division, San Francisco, CA, James A. Coda, Lois J. Schiffer, U.S. At-

torney's Office, San Francisco, CA, for Defendants.

## CORRECTED MEMORANDUM AND ORDER

HENDERSON, District Judge.

On April 29, 1999, the Secretary of Commerce issued an "initial finding" that "there is insufficient evidence that chase and encirclement by the tuna purse seine fishery 'is having a significant adverse impact' on the depleted dolphin stocks in the [Eastern Tropical Pacific Ocean]." 64 Fed.Reg. 24,590 (1999). David Brower, Earth Island Institute, The Humane Society of the United States, and other individuals and organizations (collectively "plaintiffs"), challenge the validity of this finding under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2). Plaintiffs also assert that defendants failed to comply with their obligations under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., prior to issuing the April 29, 1999 initial finding.

This matter came before the Court on Monday, April 3, 2000, on plaintiffs' and defendants' simultaneous cross-motions for summary judgment, and plaintiffs' alternative motion for a preliminary injunction. Having carefully considered the parties' written and oral arguments and the administrative record, the Court grants plaintiffs' motion for summary judgment with respect to their claim under the APA. The Secretary's initial finding shall be set aside until such time as the Secretary has an opportunity to consider preliminary results from the Congressionally mandated stress research studies. In addition, the Court grants defendants' motion for summary judgment on plaintiffs' NEPA claim, and denies plaintiffs' motion for preliminary injunction as moot.

1. The ETP extends from the coast of Southern California to South America, and covers

## I BACKGROUND

In order to place the instant dispute in context, it is necessary to set forth a number of preceding events. Beginning in 1959, fishermen in the Eastern Tropical Pacific Ocean ("ETP")[1] began widely using purse seine nets to catch yellowfin tuna that tend to congregate under schools of dolphin. *Earth Island Institute ("EIS") v. Brown,* 865 F.Supp. 1364, 1366 (N.D.Cal. 1994). "In this process, referred to as 'setting on dolphins,' the air-breathing dolphins are intentionally chased and deliberately encircled in the nets in order to catch the yellowfin tuna which may be below." *EIS v. Mosbacher,* 746 F.Supp. 964, 967 (N.D.Cal.1990). These large nets are maneuvered around the fish by means of floats and weights and are then closed like a purse upon the fish trapped inside. *Id.* at 966. Between 1959 and 1972 millions of dolphins were entangled and killed in purse seine nets. *EIS v. Brown,* 865 F.Supp. at 1366.

In 1972, Congress enacted the Marine Mammal Protection Act ("MMPA") to protect dolphins in the ETP. *See e.g. Committee for Humane Legislation, Inc. v. Richardson,* 540 F.2d 1141, 1148 (D.C.Cir.1976) (MMPA to be administered for the benefit of the protected species); 16 U.S.C. § 1361 (Congressional finding "that [dolphins] should not be permitted to diminish below their optimum sustainable population. Further measures should be immediately taken to replenish any species or population stock which has already diminished below that population"). Pursuant to the MMPA, the National Marine Fisheries Services ("NMFS") has found that three stocks of dolphins in the ETP are below their "optimum sustainable population" ("OSP"), and are thus "depleted": the coastal dolphin, *see* 42 Fed.Reg. 64,548–60 (1977), the northeastern offshore spotted dolphin, *see* 58 Fed.Reg. 58,285 (1993), and

roughly five to seven million square miles.

the eastern spinner dolphin, *see* 58 Fed. Reg. 45,066 (1993).[2]

In 1984, and again in 1992, Congress strengthened the MMPA with amendments that banned the import of tuna that failed to meet certain conditions. *See* 16 U.S.C. § 1371(a)(2)(B); 16 U.S.C. § 1411 et seq. In 1990, Congress enacted the Dolphin Protection Consumer Information Act ("DPCIA"), 16 U.S.C. § 1385. Under this statute, which is the focus of this action, tuna for sale in the United States could not display the label "dolphin safe" if the tuna was harvested using purse seine nets intentionally deployed on or to encircle dolphins.

In 1992, various Central and South American nations with purse seine fishing vessels in the ETP, along with the United States, voluntarily agreed to an "International Dolphin Conservation Program ("IDCP"), also known as the 'La Jolla Agreement.'" Nations participating in the IDCP agreed to maintain dolphin kill levels at or below a "dolphin mortality limit" assigned to each vessel, and to work toward reducing dolphin mortality to levels approaching zero. AR, Tab 13 at 673–80. Between 1989 and 1995, the Inter–American Tropical Tuna Commission ("IATTC") also held 43 workshops for tuna boat captains and others to provide information on how to reduce dolphin mortality during use of purse seine nets.[3]

In October 1995, the voluntary IDCP / La Jolla Agreement was formalized and transformed into a binding commitment called the Declaration of Panama, the terms of which were agreed to by the governments of the United States, Mexico, Belize, Columbia, Costa Rica, Ecuador, Honduras, Panama, Vanuatu, and Venezuela. Under this Declaration, the Administration agreed to seek changes in United States laws pertaining to embargoes, market access, and the dolphin safe label. AR, Tab 36 at 1230.

On August 15, 1997, Congress enacted the International Dolphin Conservation Program Act ("IDCPA"), in part to implement the Panama Declaration and eliminate the ban on imports of tuna from countries in compliance with the IDCP. AR, Tab 41 at 1267. In support of these purposes, Congress found that dolphin mortality rates in the ETP had substantially declined and that the signatory nations were committed to further reducing mortality to a level approaching zero. *Id.* at 1267–68. Indeed, since Congress enacted the MMPA in 1972, observed dolphin mortality in the ETP tuna fishery has dropped dramatically, from 423,678 deaths per year in 1972 to 15,550 per year in 1992. AR, Tab 50 at 1590. In 1993, dolphin death rates dropped again to 3,716 and have been edging downward since. *Id.* (estimating 1,900 deaths for 1998, the last year data is provided for in the record).

The provisions of the IDCPA address a number of issues pertaining to embargos and market access; the specific sections at issue here, however, concern the dolphin safe label. On this particular point, the IDCPA did *not* mirror the Panama Declaration, which sought legislation that would

---

**2.** OSP is defined as a range of population levels between maximum net productivity and carrying capacity—i.e. the historic marine mammal stock levels prior to extensive development of the tuna purse seine fishery. 16 U.S.C. § 1362(9). A species falls below its OSP if its population is less than 60 percent of its estimated "historic" levels. 45 Fed.Reg. 72178 (1980). At the time of the depletion findings, both the eastern spinner dolphin and the northeastern offshore spotted dolphins had fallen substantially below the 60 percent depletion standard. *See* Administrative Record, Tab 73 at 2140 (eastern spinner at 44 % of historic levels; northeastern offshore spotted at 19 –28% of historic levels).

**3.** Dolphin kill can be reduced, for example, by avoiding sets on large groups of dolphins, sets made at sundown that finish after dark, sets in strong underwater currents and winds, sets where the gear malfunctions or the net panels are improperly aligned, sets in storms or heavy seas and sets of long duration. *See* National Research Council, *Dolphins and the Tuna Industry,* 34–35, National Academy Press, 34–35.

immediately allow tuna caught with purse seine nets to be labeled dolphin safe if no dolphins were observed to be killed or seriously injured during the set. Rather, as discussed more fully below, there was considerable concern that while there has been great success in reducing the *observed mortality* rate for dolphins to minimum levels, and those levels are targeted for even further reductions, the use of purse seine nets to repeatedly chase and encircle dolphins may have significant, physiological *stress effects* that impedes the ability of depleted dolphin populations to recover *even if no dolphins are observed to be killed or seriously injured during the set.*[4] Accordingly, pursuant to a Congressional compromise, Congress took the following action with respect to the dolphin safe label:

First, Congress amended the MMPA to require that the Secretary of Commerce ("Secretary") commence (1) population abundance surveys of the depleted stocks, and (2) research into whether the physiological stress effects of using purse seine nets to chase and encircle dolphins is adversely affecting depleted dolphin populations prior to implementing any change in the dolphin safe label. *See* AR, Tab 73 at 2141 (statement in NMFS report to Congress acknowledging that "[c]onsiderable concern about the potential effects of stress caused by [the use of purse seine nets] led to inclusion in the IDCPA of research projects directed toward assessing the prevalence and magnitude of fishery-induced stress in the dolphins targeted by this fishery"). Specifically, Congress mandated that:

> The Secretary shall, in consultation with the Marine Mammal Commission and the Inter–American Tropical Tuna Commission, conduct a study of the effect of intentional encirclement (including

chase) on dolphins and dolphin stocks incidentally taken in the course of purse seine fishing for yellowfin tuna in the eastern tropical Pacific Ocean. The study, which shall commence on October 1, 1997, shall consist of [population] abundance surveys as described in paragraph (2) and stress studies as described in paragraph (3), and shall address the question of whether such encirclement is having a significant adverse impact on any depleted dolphin stock in the eastern tropical Pacific Ocean.

16 U.S.C. § 1414a (amending the MMPA).

Congress then detailed the specific stress studies that the Secretary was required to undertake in paragraph (3):

> The stress studies [required above] shall include—
>
> (A) a review of relevant stress-related research and a 3–year series of necropsy samples from dolphins obtained by commercial vessels;
>
> (B) a 1–year review of relevant historical demographic and biological data related to dolphins and dolphin stocks referred to in paragraph (1); and
>
> (C) an experiment involving the repeated chasing and capturing of dolphins by means of intentional encirclement.

*Id.*

Second, Congress amended the DPCIA to direct the Secretary to make, by March 31, 1999, an initial finding as to whether the use of purse seine nets is having a significant adverse impact on any depleted dolphin stock in the [ETP]. Congress further specified that the Secretary was to make this finding on the basis of (1) the stress research conducted before March 1, 1999, (2) information under the IDCP, and (3) any other relevant information:

> During the chase, dolphins exhibit flight response at top speed until exhaustion, and then are encircled, and confined within the purse-seine nets, while the captains attempt the 'backdown' procedure to allow dolphins to spill from the nets").

---

4. See AR, Tab 68 at 4331, 4332 (letter signed by 16 marine mammal scientists explaining that "NMFS research indicates that some schools of dolphins are chased and encircled several times in a single day, and repeatedly over a period of days, weeks, and months.

Between March 1, 1999 and March 31, 1999, the Secretary shall, on the basis of the research conducted before March 1, 1999, under section 1414a of this title, information obtained under the [IDCP], and any other relevant information, make an initial finding regarding whether the intentional deployment on or encirclement of dolphins with purse seine nets is having a significant adverse impact on any depleted dolphin stock in the [ETP].

16 U.S.C. § 1385(g)(1). Congress further required that the Secretary make a final finding on the same question by December 31, 2002, based on the completed stress studies, information obtained under the IDCP, and any other relevant information. 16 U.S.C. 1385(g)(2) (amending the DPCIA).

Finally, Congress provided that, pending the initial finding, the existing dolphin safe label requirements for tuna fish sold in the United States would remain in force. As noted above, those requirements only permitted use of the dolphin safe label if the tuna was not harvested with purse seine nets intentionally deployed on or to encircle dolphins. This existing standard would also remain in force "where the [Secretary's] initial finding is that the intentional deployment on or encirclement of dolphins is having a significant adverse impact on any depleted dolphin stock." 16 U.S.C. § 1385(h)(2)(A),(B). If, however, either the Secretary's initial, or final, finding did not find such an adverse impact, then the dolphin safe label would default to a new standard. *Id.* Under this standard, tuna harvested with purse seine nets and sold in the United States may be labeled dolphin safe so long as no dolphins were observed

to have been killed or seriously injured during the set. *See id.;* 16 U.S.C. § 1385(d)(2)(B).

On March 25, 1999, NMFS[5] submitted its Report to Congress (AR, Tab 73 at 2130, hereafter "Report") which addressed the available evidence regarding "whether the intentional deployment on or encirclement of dolphins with purse seine nets is having a significant adverse impact on any depleted dolphin stock in the [ETP]." Report at 2130. The Report approached this inquiry by posing two questions: (1) In the period since 1991—in which dolphin mortality rates have been very low—has the population of the depleted dolphin stocks begun to recover at the expected rates[6] or has there been a failure to recover, and (2) if there has been a failure to recover, is this failure to recover attributable to the fishery [i.e., the fishing industry in the ETP] or some other cause? Report at AR 2136.

With respect to the first question, the Report was able to provide a quantitative answer that two of the three depleted dolphin stocks were not recovering at the rate expected given the low kill rates since 1992:

*the currently depleted populations of both northeastern offshore spotted dolphins (p = 0.99) and eastern spinner dolphins (p = 0.44) are not increasing at the rate expected based on the low rate of reported mortalities from the fishery since 1991 and the reproductive potential for these populations.*

Report at 2136 (italics in original). *See also* Report at 2159 (noting that probabilities associated with this conclusion "are quite high.").[7] On the contrary, the report

---

**5.** The Secretary of Commerce delegated the authority to make the findings to NMFS. AR, Tab 78 at 2424–25.

**6.** The expected rate was based on "the dynamics in the period 1975–1991, in light of the reported time series of kill, TVOD [tuna vessel observer data] relative abundance estimates, and research vessel (RV) absolute abundance estimates." A Bayesian assess-

ment model was used to evaluate the available estimates of relative and absolute abundance and observed fishery mortality. Report at 2136.

**7.** The Report noted that some recent, unpublished correspondence from R.Allen of the IATTC raised unspecified concerns about potential biases in the TVOD [tuna vessel observer data] abundance indices. The Report

found that instead of the expected increase, the data implied that the population of the northeastern offshore spotted dolphins continued to decline from 1991 to 1998, consistent with the TVOD trend data over this time period. *Id.* at 2155–56. With respect to the eastern spinner stock, the data implied that the population had remained the same or declined slightly, again consistent with the TVOD trend data. *Id.* at 2156–57. As to the coastal spotted dolphins, the third depleted stock, the data was too sparse and unreliable to yield population abundance estimates. *Id.* at 2157–58.

Turning to the second question—whether the zero or declining growth rates are attributable to the fishery or some other cause—the Report identified one possible non-fishery related explanation: a large scale environmental variability in the ocean habitat. Report at 2148, 2159. The Report ruled out this explanation, concluding that "[t]he review of environmental conditions did not disclose any large-scale oceanographic regime shifts during recent decades," *id.* at 2160, and thus it "is unlikely that [the dolphins']failure to grow can be explained by large-scale environmental variability." *Id.*

With respect to fishery-related explanations, NMFS reported that it had no data to analyze from any of the three Congressionally mandated stress research projects that were designed to yield physical data regarding the absence or presence of stress effects in dolphins in the ETP (the necropsy sampling, the review of historical and demographic data, and the chase-recapture experiment). Thus, with respect to the issue of stress impacts from using purse seine nets, NMFS was limited to discussing the results of its stress litera-

ture review which reviewed "what is known about physiological and behavioral stress in mammals" including "stress theory and the physiology of stress." Report at 2141. The Report then related "this knowledge to the chase and encirclement of dolphins in the ETP tuna purse seine fishery."as follows:

Potential stress effects of specific fisheries operations (search, chase, and capture) on the dolphins involved in the ETP fishery are identified. Search operations may disrupt habitats utilization, foraging activities, and social activities. Capture and pursuit have been documented to cause stress, assessed by adrenocortical activity, in terrestrial mammals and cetaceans. Chase and capture operations of the fishery *are likely to* cause immediate or short-term physiological responses such as activation of the hypothalamic-pituitary-adrenal axis in response to psychological or social stressors associated with these operations. *Psycho-social stressors that are likely to affect the dolphins include separation of mother and young, separation from social groups, social aggression during net confinement, and novelty. Other potential short-term responses of dolphins to chase and capture include severe muscle damage, resulting in a condition known as capture myopathy and hyperthermia. Both of these conditions could cause unobserved mortality.*

*The potential effects of long-term stress include stress induced pathologies, impairment to the immune system, and impaired reproduction, growth, and metabolism. Based on information from other mammals it seems likely that the reproductive cycle for some female dolphins will be disrupted, either as a re-*

---

indicated that NMFS would carefully explore these concerns but that NMFS would necessarily rely on the peer-reviewed published abundance indices utilized in the report. The Report further explained that "given the substantial body of peer-reviewed work cited above which supports the validity of these indices to track abundance trends, and in

particular the analyses that found little evidence that abundance estimates have been affected by major changes in the fishery (such as the use of helicopters for searching), the NMFS accepts the assertions in these publications and has used TVOD abundance indices as measures of relative abundance in the assessments." Report at 2136–37, 2147–48.

*sult of the hypothalamic-pituitary-adre-
nal response to stress or through the
development of pathologies resulting
from chronic stress.* Cow-calf separa-
tion can occur as the result of chase and
capture, and it is likely that this separa-
tion will result in the calf's death, at
least for younger calves. Further, it
appears that young animals may be par-
ticularly vulnerable to impacts of fisher-
ies operations. Maternal separation and
novelty are likely to induce significant
hypothalamic-pituitary-adrenal response
in young animals, and this can result in
impaired growth.

Report at 2141–42 (emphasis added). The
Report then concluded that while the ex-
isting stress literature in mammals cannot
provide a "quantitative or definitive an-
swer" to the question of whether the tuna
fishery is causing stress to affected dolphin
populations, "the available information and
evidence point to the *likelihood* that physi-
ological stress is induced by fisheries activ-
ities. It is therefore plausible that stress
resulting from chase and capture in the
ETP tuna purse-seine fishery *could have a
population level effects* on one or more
dolphin stocks." *Id.* at 2142 (emphasis
added); *see also id.* at 2161 ("A review of
literature on stress in mammals suggested
that fishery-caused stress is a plausible
contributor to such a failure [to recov-
er]").[8]

The Report subsequently set forth its
"Decision Analysis Framework" in which it
posed three questions with respect to the
"Stress Component of Attribution of
Cause":

Question 3a. "Is chase and encircle-
ment a generally plausible cause of
stress?"

Question 3b. "Is stress a generally
plausible cause of depression in popula-
tion growth?"

Question 3c. "Is there physiological evi-
dence of stress in individuals from the
affected dolphin populations?"

*Id.* at 2150–251. The Report concluded
that answer to Question 3a is an "affirma-
tive yes," and that the answer to Question
3b is "was partially but not definitively
answered affirmatively by the stress litera-
ture review." Report at 2151. It noted
that the answer to Question 3c was not yet
available but may be so at the completion
of the necropsy sampling program.[9]

In the Report's final "Discussion and
Conclusions" NMFS emphasized that ana-
lyzing adverse impact (beyond observed
mortality) to a marine wildlife population
is always a difficult undertaking and that
answers to the questions posed in the re-
port may never be conclusively answered.
Report at 2159. Based on the data and
information available, however, the Report
concluded that:

When [the failure of the (1) northeastern
offshore spotted and (2) eastern spinner
dolphins to recover as expected is] con-
sidered with the qualitative answer from
oceanographic studies (that it is unlikely
that such a failure to grow can be ex-
plained by large-scale environmental
variability) and the qualitative answer
from the literature review (that it is
plausible that stress resulting from
chase and encirclement could have popu-
lation level effects), *the information sug-
gests but by no means conclusively that
the fishery has been the source of signif-
icant adverse impact on these two popu-
lations.*

---

8. *See also* AR, Tab 49 at 4196, 4199 (Feb. 12,
1999 letter from Marine Mammal Commis-
sion concluding that the relevant stress-relat-
ed literature "provides *compelling* support for
the conclusion ... that the best available data
suggest that chase and capture of dolphins in
the [ETP] could be having population-level
effects because of stress-induced changes in
the life spans and productivity of individual
dolphins") (emphasis added).

9. In addition to addressing the effects of
stress, the Report noted but did not discuss
two other possible fishery-related explana-
tions for the failure to recover: the separation
of cows and calves and the under reporting of
dolphin mortality. Report at 2160.

*Id.* (emphasis added); *see also id.* at 2161.[10] Significantly, neither the Report nor the administrative record reflect the existence of any conflicting evidence with respect to this conclusion.[11]

On April 29, 1999, the Secretary of Commerce published his "initial finding" under the IDCPA "that there is insufficient evidence that chase and encirclement by the tuna purse seine fishery 'is having a significant adverse impact' on depleted dolphin stocks in the ETP." AR, Tab 78 at 2424 (64 Fed.Reg. 24,590); *id.* at 2426 ("NMFS has determined that there is insufficient evidence to conclude that intentional deployment on or encirclement of dolphins with purse seine nets is having a significant adverse impact on any depleted dolphin stock in the ETP"); *id.* ("While the rate of recovery of the dolphin stocks may be lower than expected, there is insufficient information to conclude that there has been a significant adverse impact on the depleted stocks"). The Secretary further elaborated that the "Report to Congress does not provide evidence that the ETP tuna purse seine fishery is the cause of the apparent failure of the northeastern offshore spotted dolphin and eastern spinner dolphin stocks to recover as expected . . . ." *Id.* The Secretary also stated "that the current low level of observed dolphin mortalities in the ETP tuna purse seine fishery creates an expectation that the fishery will not prevent the depleted populations from recovering." *Id.* Pursuant to this initial finding, the dolphin safe tuna label standards changed, effective February 2, 2000, to permit display of the dolphin safe label where the tuna is caught in the ETP using purse seine nets, so long as no dolphins were observed to have been killed or seriously injured during the set. *See* AR, Tab 78 at 2424; 65 Fed.Reg. 3 (2000).

Plaintiffs subsequently filed the instant complaint alleging that the initial finding must be set aside under the Administrative Procedures Act, 5 U.S.C. § 702 et seq. on the grounds that it is an abuse of discretion, not in accordance with the law, and inconsistent with the plain terms and purposes of the MMPA, the DPCIA and the IDCPA. Specifically, plaintiffs contend that the Secretary improperly failed to make a "finding" as required by the IDCPA, failed to undertake the mandated stress effects research, applied too strict a standard in evaluating the evidence, and abused his discretion, given the record, in failing to find a significant adverse impact. Plaintiffs also assert that defendants violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332 by failing to prepare an Environmental Assessment or Impact Statement in connection with the initial finding. Defendants dispute each of these points and further assert that this Court lacks jurisdiction over this matter because (1) plaintiffs lack standing to bring their claims, and (2) the initial finding is not ripe for review because it does not constitute a final agency action.

## II  DISCUSSION

### A.  SUBJECT MATTER JURISDICTION

#### (1)  Plaintiffs' standing

In order to demonstrate standing to proceed with this action, plaintiffs must

---

10. Consistent with this conclusion is a letter from 16 marine mammal scientists who have "conducted research on cetaceans and have observed the impacts of human activity on them." AR, Tab 68 at 4331 (stating that "we believe that research on the effects of human activities on dolphins demonstrates that it is highly likely that the activities of the [ETP] tuna fleets are causing significant negative impacts on dolphins in addition to the direct mortalities counted by observers").

11. With respect to the coastal spotted dolphins, the third depleted stock in the ETP, the Report stated that because "[m]uch essential information is lacking for coastal spotted dolphins, especially from the early years of the fishery . . . . *it is not possible at this time to determine if chase and encirclement by the purse seine fishery is having a significant adverse impact on the coastal stock of spotted dolphins.*" Report at 2137 (italics in original).

show that at least one named plaintiff has suffered (1) an injury in fact, that (2) is fairly traceable to defendants' conduct, and (3) which is likely to be redressed by the relief sought. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264, n. 9, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (standing by one plaintiff sufficient to proceed). With respect to the injury in fact requirement, plaintiffs must demonstrate an injury that is (a) concrete and particularized, (b) actual and imminent, and (c) not conjectural or hypothetical. *Didrickson v. U.S. Dep't of the Interior*, 982 F.2d 1332, 1340 (9th Cir.1992) (citation omitted). In the context of animal preservation cases, the Ninth Circuit has observed that "[o]ne 'who observes or works with animals of a particular species in the very area of the world where that species is threatened by a federal decision' may plausibly claim [harm], 'since some animals that might have been the subject of his interest will no longer exist.'" *Id.* (quoting *Lujan*, 504 U.S. at 560–61, 112 S.Ct. at 2140).

Plaintiffs have submitted detailed declarations from plaintiffs David Phillips, marine biologist and Executive Director of plaintiff Earth Island Institute ("EIT"), Mark Palmer, zoologist and Assistant Director for the International Marine Mammal Project of EIT, and David Brower, Chairman of the Board of Directors for EIT.[12] These declarations establish that the members and staff of EIT travel to the ETP to study, observe and enjoy dolphins and have specific plans to continue such activities in the near future. *See* Phillips Decl. ¶¶ 5, 8, Palmer Decl, ¶¶ 7–10 (discussing planned expedition to the ETP in early 2001 to study and photograph dolphins); *see also Didrickson*, 982 F.2d at

1340–41 (finding standing in part based on declarations that organizational members study, observe, and enjoy sea otters in Alaska); *Coast Alliance v. Babbitt*, 6 F.Supp.2d. 29, 32–33 (D.D.C.1998); *accord Japan Whaling Assoc. v. American Cetacean Society*, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986).

Plaintiffs' declarations further aver that if the dolphin safe label standard changes to allow its display when the tuna is harvested using purse seine nets, that this will increase the use of purse seine nets which in turn will harm more dolphins and affect the ability of EIT and its staff and members to study, enjoy and observe dolphins in the ETP. *See* Phillips Decl. at ¶¶ 9–11,13, 16–18; Palmer Decl. at ¶ 10; Block Decl. at ¶¶ 3–6, and attached Exhibit (indicating that United States purse seine vessels, which had previously stopped fishing for tuna in the ETP in 1995, *see* AR, Tab 50 at 1590 and Report at 2142, are taking steps to return).

Plaintiffs' declarations also establish that they are actively concerned with maintaining the integrity of the dolphin safe label, which has been the subject of a significant amount of plaintiff EIT's programmatic efforts, and that they rely upon the label in making their canned tuna purchases, and that they will be injured by a change in the label. Brower Decl. at ¶ 5; Phillips Decl. at ¶¶ 7, 9, 18; Palmer Decl. at ¶ 6. The declarations submitted also indicate that EIT itself has organizational standing, given its specific programmatic concerns. *See* Phillips Decl. at ¶¶ 5–6, 8, 9, 11, 15, 18; *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (organizational standing can be established where discrete programmatic concerns are being directly and

---

12. The purposes of the EIT include the observation, protection and conservation of ETP dolphins. It currently employs twelve monitors who regularly check tuna shipments, vessels and canneries in eighteen countries including Mexico and Costa Rica. Since 1990,

EIT has also been actively involved in trying to maintain strict labeling standards for tuna and keeping members and other consumers informed on this issue. Phillips Decl. at ¶¶ 3–7,9–10, 18.

adversely affected by the challenged action).

Defendants do not specifically challenge plaintiffs' declarations. Rather, they initially respond that plaintiffs lack standing because they have not identified injury to a particular animal in which plaintiffs have an interest. "Unlike Keiko the orca whale, there is no such identifiable individual dolphin." Defs' Reply at 7. Defendants cite no authority, however, that would require such an individualized interest in order to assert standing. Defendants also argue that plaintiffs lack standing because the initial finding has not caused any changes in the ongoing practice of purse seine fishing in the ETP, and therefore can not cause any harm to the plaintiffs. *See* Lecky Decl. at ¶ 5 (statement from NMFS administrator that to his knowledge, the change in the labeling standard has not affected fishing practices by United States or foreign purse seine vessels in the ETP). Plaintiffs have submitted unrebutted evidence, however, that vessels from Ecuador and the United States have taken steps to utilize purse seine nets in the ETP for the year 2000. *See* Block Decl. at ¶¶ 3–6. In short, defendants' contentions that plaintiffs lack standing are not persuasive, and the Court is independently satisfied, given the declarations presented, and the record in this case, that plaintiffs have established standing to proceed with this action.

### (2) *Finality of Agency Action*

When a plaintiff seeks review of agency action under the APA, 5 U.S.C. § 704, the "finality" of that action is an "independent jurisdictional requirement." *Public Citizen v. Office of U.S. Trade Rep.*, 970 F.2d 916, 921 (D.C.Cir.1992). It is not one, however, that has been narrowly construed. "By enacting a provision permitting judicial review of 'final agency action' for which there is no other adequate remedy in a court, Congress intended to cover a broad spectrum of administrative actions, and the Supreme Court has reaffirmed

that intent by holding that the [APA]'s generous review provision must be given a hospitable interpretation." *Sabella v. U.S.*, 863 F.Supp. 1, 3 (D.D.C.1994).

As a general rule, two conditions must be satisfied for agency action to be considered "final" and thus reviewable under the APA: "First, the action must mark the 'consummation' of the agency's decision-making process [citation omitted]—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow' [citation omitted]." *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 1168, 137 L.Ed.2d 281 (1997).

Here, the Secretary's initial finding, published in the Federal Register, represents the culmination of a lengthy administrative process (contained in seven volumes). It also has the indisputable, self-executing legal consequence of changing the standards applicable to the dolphin safe label under the IDCPA. 16 U.S.C. § 1385(h)(1), (2). As the initial finding itself acknowledges: *"Because of this initial finding,* the 'dolphin safe' labeling standard . . . *will change* on the effective date of the final regulations to implement the IDCPA." AR, Tab 78 at 2426 (emphasis added); *see also id.* at 2424 (*"Based on this initial finding* . . . tuna products containing tuna harvest in the ETP by purse seine vessel . . . may be labeled 'dolphin-safe' . . . if no dolphins were killed or seriously injured during the set in which the tuna were caught") (emphasis added). Given the above, the Secretary's assertion that the initial finding is not a "final agency action" because it simply "served to provide information to consumers" and is a "stand-alone scientific finding" is specious. *See also Japan Whaling*, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (decision by Secretary of Commerce not to certify Japan for failing to abide by whaling quotas was final agency action); *Franklin v. Massachusetts*, 505 U.S. 788, 796, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992).

The Secretary also emphasizes that the initial finding does not specify the exact date of its implementation; rather, it states that the "initial finding will become effective on the effective date of the final regulations to implement the IDCPA which will be published in the Federal Register." AR, Tab 78 at 2424. The absence of an effective date, the Secretary argues, deprives the finding of "finality." Rather, he argues, it is only the final interim IDCPA regulations—which specify February 2, 2000 as the effective date for the initial finding, but do not substantively discuss the finding—that is reviewable under the APA. *See* 65 Fed.Reg. 30 (Jan. 3, 2000).

This argument is similarly unpersuasive. The purpose of the finality requirement is to avoid review of agency actions that are interlocutory in nature, non-definitive, or non-binding so as to "prevent excessive judicial interference with agency policy formation." *See Sabella*, 863 F.Supp. at 2-6. Here, the initial finding permitted no further discretionary, or substantive acts, nor any additional policy formation on the part of the Secretary. As such, judicial review of the initial finding can in no way interfere with internal agency processes. Moreover, the Secretary has no discretion to forego implementing the initial finding; on the contrary, its implementation is statutorily mandated. *See* 16 U.S.C. § 1385(h)(1) (unless otherwise required by a finding under subparagraph (h)(2), certifications required for dolphin safe label "shall" change).

It is certainly conceivable that the lack of an implementation date might in some circumstances raise a ripeness issue—not, however, because the agency decision lacks "finality"—but because there might be no case and controversy if the final action is never implemented. This is not such a case, however, given that defendants have already determined the effective date, and that date has passed. The Secretary has also already notified the Court that, beginning April 11, it intends to allow tuna caught by Mexican vessels using purse seine nets to display a dolphin safe label, so long as no dolphins were observed to have been killed or seriously injured during the set. *See* Defs' March 30, 1999 Notice. Accordingly, and for all the reasons discussed above, this Court concludes that the initial finding is a "final agency action" for purposes of review under the APA.

### B. *APA CLAIM*

#### (1) *Legal Standard*

Under the APA, the Court reviews the Secretary's April 29, 1999, initial finding, in light of the administrative record,[13] to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A),(D). Although the standard of review is " 'narrow,' " the Court's inquiry must be " 'searching and careful.' " *Southern Offshore Fishing Ass'n v. Daley*, 995 F.Supp. 1411, 1425 (M.D.Fla.1998) (citation omitted). The Court's review should, however, be deferential to the agency's expertise, "particularly with respect to decision-making which involves 'a high level of technical expertise.' " *Defenders of Wildlife v. Babbitt*, 958 F.Supp. 670, 679 (D.D.C.1997). For example, where there are competing expert opinions, " '[i]t is the prerogative of [the Secretary] to weigh those opinions and make a policy judgment based on the

---

**13.** The parties have stipulated to proceed on the basis of the administrative record. As such, the issues in this case involve pure questions of law and legal questions of factual sufficiency, making summary adjudication particularly appropriate. *See e.g. McCall v. Andrus*, 628 F.2d 1185, 1189–90 (9th Cir.

1980) (Summary judgment generally appropriate in APA cases). Notably, neither party has identified the existence of any genuine dispute of material fact or otherwise suggested that this case can not be resolved on summary judgment.

scientific data.'" *Southern Offshore,* 995 F.Supp. at 1433.

The deference accorded an agency's scientific or technical expertise is not, however, "unlimited." *Defenders of Wildlife,* 958 F.Supp. at 679. The presumption of agency expertise may be rebutted if its decisions, even though based on scientific expertise, are not reasoned. *See id.* Nor may the agency disregard Congressional intent. *See Conner v. Burford,* 848 F.2d 1441, 1454 (9th Cir.1988) (setting aside agency action where agency violated clear mandate of statute); *American Mining Congress v. U.S. Army Corps.,* 951 F.Supp. 267, 278 (D.D.C.1997), *aff'd* 145 F.3d 1399 (D.C.Cir.1998) (same). With the above considerations in mind, the Court turns to the specific issues in contention.

*(2) Whether the Secretary's initial finding was not in accordance with the law or an abuse of discretion*

█ Plaintiffs contend that the Secretary's initial finding—that there was insufficient evidence upon which to find that the use of purse seine nets to chase and encircle dolphins is having a significant adverse impact on depleted dolphin populations in the ETP—was not in accordance with the law, and constitutes an abuse of discretion because the Secretary failed to (1) obtain and consider preliminary data from the Congressionally mandated stress research projects, and (2) apply the proper legal standard to the scientific information available. Having carefully considered the record and applicable statutory mandates, this Court agrees, for the reasons discussed below, that the Secretary's initial finding must be set aside until such time as the Secretary has an opportunity to consider preliminary results from the mandated stress research projects.[14]

*(i) Stress-effects Research*

As described above, at the time the IDCPA was enacted, the dolphin-safe label could not be displayed if the tuna was caught with purse-seine nets intentionally deployed to chase and encircle dolphins in the ETP. As the plain language of the IDCPA makes clear, Congress did not intend for this standard to change if the use of purse seine nets "is having a significant adverse impact" on depleted dolphins stocks, notwithstanding the very low observed dolphin mortalities that have been achieved using these nets over the last several years. 16 U.S.C. § 1385(h)(2). To this end, Congress directed the Secretary to promptly commence specific research projects to provide additional information on whether using purse seine nets to repeatedly chase and encircle dolphins is adversely affecting depleted dolphins stocks. 16 U.S.C. § 1414a. As previously discussed, Congress was particularly concerned about the potential adverse stress effects from repeated chase and encirclement in purse seine nets. *See* Report at 2141 ("Considerable concern about the potential effects of stress caused by [the use of purse seine nets] led to inclusion in the IDCPA of research projects directed toward assessing the prevalence and magnitude of fishery-induced stress in the dolphins targeted by this fishery").

Importantly, Congress rejected language that would have immediately changed the label to allow tuna caught with purse seine nets to be labeled *dolphin safe, See* H.R.Rep. No. 105–74 (Part 1), *reprinted in* 1997 U.S.C.C.A.N. 1628, and instead kept the purse seine net restriction in place precisely so that the stress effects could be investigated and considered before any change in the label standard. 16 U.S.C. § 1385(h)(2). As the initial finding itself acknowledges, "In order to implement the Panama Declaration, Congress enacted the IDCPA. However, Congress was reluctant to permit the labeling standard to change immediately *without additional research on fishery impacts* on de-

---

14. In light of this conclusion, the Court does not address plaintiffs' argument that the Secretary violated the IDCPA by failing to make a specific finding of either "significant adverse impact" or "no significant adverse impact."

pleted dolphin stocks." AR, Tab 78 at 2425 (emphasis added).

Significantly, the statutory language on this point is mandatory and direct. Congress stated that the Secretary *"shall"* conduct a study "of the effect of intentional encirclement (including chase) on [dolphins in the ETP]" which *"shall* commence on October 1, 1997." 16 U.S.C. § 1414a(1) (emphasis added). Given that the IDCPA was not enacted until August 15, 1997, Congress was clearly signaling its intent that the agency should get the study underway promptly and without delay. Congress further specified that the study *"shall"* consist of (1) "population abundance surveys" and (2) *"stress studies." Id.* (emphasis added). With respect to the stress studies, Congress was quite detailed and explicit. Such studies, it stated, *"shall include"* three research projects designed to elicit actual data regarding the presence (or not) of stress in dolphins in the ETP, along with a stress literature review. 16 U.S.C. § 1414a(3) (emphasis added). Congress further stated that the Secretary "shall *on the basis of the research conducted before March 1, 1999 under section 1414a ... make an initial finding ...* " 16 U.S.C. § 1385 (emphasis added). By expressly stating that the initial finding must be made, in part, "on the basis of" section 1414a research conducted by March 1, 1999, it is readily apparent that Congress contemplated that the agency would consider at least preliminary data from the stress research projects in making the initial finding, given that this finding would determine any change in the dolphin safe label standard. *See also* AR, Tab 36 at 4159 (Jan. 8, 1999 letter from Marine Mammal Commission to NMFS stating

that although Congress may not have been explicit, its intent was clear: "Congressional intent was for the assessment of 'a 3-year series of necropsy samples' to have begun in January 1998 so that at least preliminary information would be available for consideration as part of the March 1999 determination").

In sum, while Congress did not require or expect that any of the three stress research projects would be completed by the time of the initial finding, it clearly intended that the initial finding would be informed by at least some preliminary data from these projects. After all, as defendants do not dispute, it was concern over the stress effects of purse seine nets that caused Congress to reject an immediate change in the label, and instead order research on those very stress effects to commence eighteen months prior to the initial finding. Thus, there can be little doubt that this statutory scheme contemplated that the Secretary's initial determination, on March 31, 1999, would be as informed as possible by the scientific evidence available from *each* of the mandated stress studies. *See* 16 U.S.C. § 1414a (requiring research projects); 16 U.S.C. § 1385(g)(1) (requiring initial finding to be made in part on basis of research conducted by March 1999).[15]

It is undisputed, however, that NMFS did not consider preliminary data from *any* of the three mandated stress research projects prior to the time of the initial finding. With respect to the first project—a necropsy study—this requires placing trained necropsy technicians on board vessels to collect tissues samples from dolphins killed in the ETP fishery.

**15.** Because the statutory provisions at issue were the result of a last minute Congressional compromise there are no Committee Reports, which are the most reliable source of Congressional intent. Rather, the only legislative history consists of floor statements which, as defendants point out, are accorded less weight. The Court notes, however, that the floor statements presented to the Court are supportive of the clear intent expressed by the

language of the statute. *See e.g.* 143 Cong. Rec. H6671-01 (Statement of Congressman Gilchrest) ("Mr. Speaker, the reason the label does not [potentially] change until March of 1999 is a compromise worked out ... to pursue a very scientific study of what the dolphins go through under this new regime."); 143 Cong. Rec. E. 1608-01 (Statement of Congressman Delahunt).

*See* Report at 2142. These samples will include a wide variety of histological and morphological tissue, and allow for the collection and analysis of adrenal glands. *Id.* By the time of the initial finding, the only concrete activity that had occurred toward this end was a three-day training for technicians on January 19–21, 1999. *Id.*

Defendants contend that it was impossible to obtain any necrospy samples from foreign vessels prior to the initial finding due to their lack of cooperation. *See* Defs' Mtn at 26 ("No data from the Agency's necropsy sampling program was considered ... because no vessels that set on dolphins were made available ... for the collection of data in time for consideration in the Finding").[16] The record, however, makes it clear that Mexico was more than willing to cooperate in the necropsy research. According to the Report, Mexico had "agreed to participate in the necropsy sampling program," Report at 2135, and "to work with the NMFS ... to conduct a pilot necropsy study." *Id.* at 2142. A draft report from a January 1999 planning meeting further underscores Mexico's willingness to cooperate: "Mexico indicated that they had already identified four vessels that would be appropriate sampling platforms for the necropsy pilot program ...." AR, Tab 13 at 3923; *id.* at 3925 ("Mexico repeatedly expressed strong commitment to facilitating the necropsy program to the full extent possible."). Nor does the Secretary's "lack of cooperation" argument explain why the Secretary was able to begin necropsy sampling in October 1999, six months after the initial finding.[17]

In any event, given Mexico's agreement to participate in the necropsy research project, the record fails to provide any persuasive justification as to why it would not have been feasible for NMFS, with active and diligent efforts, to have started sampling prior to the initial finding. While such a project is no doubt complex, there has been no showing that this complexity genuinely prevented NMFS from obtaining preliminary data from the necrospy research project.

With respect to the chase and recapture research project, this study is intended to provide physiological samples from live dolphins to complement the necropsy program. Specifically, "the chase-recapture samples are intended to provide information about dynamic changes in physiological systems affected by chase, capture and release." Report at 2144. Apparently, NMFS had already held a planning workshop for this project in July 1997. *Id.* However, NMFS stated in the Report that because the concept and execution of this project is "especially complex," it planned to "initiate additional formal research planning in mid–1999" and conduct the experiment in February—April 2001. Report at 2144. Neither the Report nor record, however, provides any justification as to why NMFS did not "initiate additional research planning" until "mid–1999"—roughly two years after the July 1997 workshop. And while the Court does not doubt that this research project also raises complex issues, general assertions of complexity do not adequately explain why NMFS could not have obtained preliminary results from a chase and recapture study prior to the initial finding.

With respect to the 1–year historical and demographic data research project, the "intent [of this project] is to assess the potential of *existing archived samples* from the fishery [18] for determining fishery-

---

**16.** As of the date of the Report, United States vessels were not using purse seine nets to catch tuna in the ETP. Report at 2142.

**17.** At argument, the Secretary confirmed that, beginning in October 1999, technicians started collecting some necropsy samples from

one or more Mexican vessels as part of a pilot program.

**18.** Between 1975 and 1990, thousands of samples of dolphin reproductive organs, teeth, blood stains and skin were collected. Also, over 500 biopsy samples were taken

related stress in ETP dolphins .... These samples, while not necessarily ideal for all purposes, *represent a readily available source of material* for examination." Report at 2143 (emphasis added). The Report further explains that two lines of investigation were identified for exploration: molecular genetic methodologies and cow/calf relationships. It concludes, with respect to both lines of investigation, that while research and an investigation of methods is "underway," final results will not be available until the final finding in 2002. *Id.* at 2143–44. The record does not satisfactorily demonstrate why at least some preliminary results from this "one year" study, to have commenced in October 1997, could not have been available prior to the initial finding. Nor does the Report indicate that any such preliminary results were considered or discussed in connection with the initial finding. *See e.g.* Report at 2136 (Noting that this research project appears "sufficiently promising to be continued *and included in the final finding* ") (emphasis added); *id.* at 2159–61.

In their papers, defendants assert that preliminary results from the mandated stress research projects "could not be [ ] available in time for the initial finding." Defs' Reply at 12. The Court is not persuaded, however, for the reasons discussed above, that the record supports this conclusion; rather, the Court is far from convinced that the Secretary actively and diligently sought to obtain preliminary data from the three stress research projects designed to yield actual data involving dolphins from the ETP.

Defendants also emphasize that Congress did not set any deadline for completing the studies, other than that they had to be finished prior to the final finding. While it is true that all of the studies must be *completed* prior to the final finding, 16 U.S.C. § 1385(g)(2), this misses the point since plaintiffs are not contending that NMFS was required to complete the stud-

during the 1998 abundance survey. *See* Re-

ies prior the initial finding. Rather, as discussed above, they correctly argue that Congress intended that defendants promptly *commence* the stress research projects so that any finding triggering a label change would be informed by at least some preliminary scientific data on the critical issue facing the Secretary: whether the stress effects of purse seine nets is having a significant adverse impact on depleted dolphin stocks in the ETP. Yet, almost two-and-a-half years later, it appears that the Secretary is still in the planning and design stage for one project, has barely begun obtaining data in another, and is making some unspecified progress on the third.

Defendants alternatively argue that because the statute does not define the term "commence," that the Secretary should be accorded discretion in the scheduling of the studies. While perhaps not defined, a term as unambiguous as "commence" needs no definition. Defendants also argue that even assuming the studies had to "commence" by October 1, 1997, the studies *are* "progressing," and given their scientific complexity, the agency must be accorded discretion and deference in the specific scheduling and timing of the studies. The Court agrees that an agency normally should be accorded flexibility in these matters; where, as here, however, the statutory scheme imposes a specific time frame, and Congress expresses a clear intent that at least some preliminary results be available by a fixed date, this flexibility must yield to the expressed Congressional intent. This is particularly so in this case, given that the record fails to demonstrate an inability to act consistent with Congressional intent. Nor, the Court notes, did Congress distinguish between the specific components of the study or otherwise indicate that the agency had discretion to pursue some components (e.g. the population abundance survey) more actively than others (e.g. the stress research projects).

port at 2143.

Given all of the above, the Court concludes that NMFS' failure to obtain and consider preliminary data from any of the mandated stress research projects failed to comport with both the spirit and the letter of the law. Moreover, as discussed below, when this failure is considered in light of (1) the evidence that *was* available to the Secretary, (2) the standard the Secretary agrees should be applied to the evidence in making his initial finding, and (3) the purpose of the statutory provisions at issue, the Secretary's decision to trigger a change in the label—on the ground that a finding of "significant adverse impact" could not be made for lack of sufficient evidence—violates Congress' clear intent, and thus can not withstand scrutiny, even under the narrow standards of the APA.

*(ii) The available scientific information*

As discussed earlier in more detail, the scientific information that *was* available from the mandated studies—that is, from the population abundance surveys and the stress literature review—and other relevant sources, all pointed in the direction of a significant adverse impact. Despite minimal observed kill rates from purse seine nets for several years, the population abundance surveys showed that two of the depleted stocks were not recovering *at all,* much less at the anticipated rate, and one was showing a further decline.[19] The stress literature, while certainly not conclusive, demonstrated that it was likely that dolphins experience a multitude of harmful stress effects from the chase and capture process, and that it was scientifically plausible that such effects could be causing population level effects. The *only* non-fishery related explanation identified—a major shift in the ocean environment—was ruled out. As such, NMFS' Report concluded that the information available "suggests but by no means con-

clusively that the fishery has been the source of significant adverse impact on these two [eastern spinner and northeastern offshore spotted] populations." Report at 2159. Significantly, the record reflects no disagreement among experts on any of these points.

The missing evidence that prevented firmer conclusions—*one way or the other*—on the central issue of stress, and thus the ultimate issue of significant adverse impact, was the actual physiological data from dolphins in the ETP that NMFS was to obtain from the three stress research projects mandated by Congress. As NMFS emphasized, the stress literature review was by itself unable to provide any specific evidence on this. *See e.g.* AR, Tab 78 at 2425. Thus, as the Secretary emphasized, "[m]ore scientific research is necessary to better evaluate the effect of the tuna purse seine fishery on depleted dolphin stocks in the ETP." *Id.*

At the same time, defendants have repeatedly affirmed in their briefs and at argument that a "finding" of significant adverse impact does not require "conclusive evidence," "proof," or "scientific certainty" of such an impact. *See e.g.* Defs' Opp. at 7 ("NMFS is not stating that the test to be employed is one of 'conclusive evidence'"); *id.* at 7–8 ("The fact that the data will never be conclusive will not prevent NMFS from carrying out the statutory directive ... and provide its best professional assessment, based on [the] available data and evidence..."); April 3, 2000 Tr. at 49 (Agreeing that Congress did not intend standard to be conclusive proof); *see also* AR, Tab 78 at 2425 (finding turns on whether "the best scientific information available ... supports a scientific conclusion that the fishery is causing a 'significant adverse impact ....'"). This is consistent with the case law, which

**19.** NMFS' Report noted that it was possible that the time since dolphin mortalities rates have been substantially reduced (1991) is not long enough to allow detection of recovery. The Report stated, however, that it lacked any

clear evidence that there are any additional, unaccounted for, time lags in population response and the Initial Finding does not rely on this factor in its articulated rationale.

acknowledges that scientific findings in the area of marine mammal conservation must often by necessity be made on the basis of less than complete or perfect information. *See e.g. Southern Offshore* 995 F.Supp. at 1432 ("Difficulties with data and the nature of the scientific method are expected in managing a resource as elusive as a fishery"); *Trawler Diane Marie, Inc. v. Brown,* 918 F.Supp. 921, 929 (E.D.N.C.1995) (in making decisions under MMPA, agency may rely on information that is not exact or totally complete). Indeed, as NMFS emphasized, there may never be conclusive evidence on the subject. Report at 2159.

Thus, while the Secretary has not specified the exact degree of evidence required to "find" a significant adverse impact—or to state it somewhat differently—while the Secretary has not specified the degree of uncertainty a "finding" of significant adverse impact can accommodate, it appears clear that he is looking for something in between the evidence presently available, which is suggestive of a significant adverse impact but is missing actual data from ETP dolphins, and evidence that would be conclusive. At oral argument, counsel for the Secretary suggested that the Secretary would need some additional "verifiable scientific evidence." April 3, 2000 Tr. at 49.[20]

Taking all of the above together, the Court is presented with a situation in which (1) the record that *was* available to the Secretary "suggest[ed] but by no means conclusively" that, notwithstanding the low observed mortality rates, purse seine nets are having significant adverse effects on depleted dolphin populations— and was devoid of conflicting evidence; (2) the Secretary has determined that a finding of significant adverse impact is not dependent on conclusive evidence, proof, or certainty, but rather requires some unspecified amount of additional, verifiable scientific evidence, and (3) the Secretary failed, without a persuasive, much less compelling, justification to obtain even preliminary data from any of the Congressionally mandated stress research projects that would provide critical information regarding actual stress impacts in ETP depleted dolphin stocks.

Given these circumstances, the Secretary's decision to trigger a label change— without the benefit of *any* preliminary data from the three mandated stress research projects designed to elicit information on the specific stocks affected—flies in the face of Congress' manifest intent that the dolphin-safe label remain in force and not immediately change precisely so that research from mandated stress research projects could be used to inform an initial finding as to whether the deployment of

---

**20.** As defendants point out, Congress did not specify the standard the Secretary must use in evaluating the evidence and determining whether it can make a "finding" of significant adverse impact. As such, the Secretary is entitled to exercise discretion in formulating the appropriate standard so long as it is based on a reasonable construction of the statute. *See Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The Court further notes that it does not agree with plaintiffs that statements in the NMFS Report demonstrate that the Secretary improperly applied a standard of "conclusive proof." Plaintiffs cite, for example, the statement in the Report's conclusion that the "data are not entirely conclusive, nor will they ever be so, even with many additional years of information." Report at 2159. This

statement and the others cited, however, are clearly intended to simply be descriptive of the evidence. They do not represent a statement of the legal standard employed by the Secretary when making the initial finding. Plaintiffs also seek to infer a standard of conclusive proof from certain statements in the initial finding itself. Taken in its totality, however, the initial finding does not clearly support this inference. Finally, plaintiffs point to a Department of Commerce press release which states that the Secretary was required to make the labeling change because "the research study does not show with certainty that the depleted dolphin stocks are adversely affected." AR, Tab 46 at 4586. An unsigned press release is not, however, by itself, evidence of the legal standard applied by the Secretary.

purse seine nets is having a significant adverse impact on depleted dolphin stocks in the ETP. The fact that the scientific evidence that *was* available to Secretary "suggest[ed] but not conclusively" significant adverse stress effects, and that a finding of such impacts is properly made on less than conclusive evidence, only underscores the fact that a decision to change the label—without the benefit of any results from the critical stress research projects—can not be squared with Congress' clear intent. *Cf. Conner v. Burford,* 848 F.2d 1441, 1455 (9th Cir.1988) (setting aside agency action where agency violated clear mandate of statute); *American Mining Congress,* 951 F.Supp. at 278 (setting aside agency regulation inconsistent with statutory intent), *aff'd* 145 F.3d 1399 (D.C.Cir.1998); *Coast Alliance,* 6 F.Supp.2d at 34–37 (setting aside agency action inconsistent with statutory language because agency "'must give effect to the unambiguously expressed intent of Congress'") (citing *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694).

### (iii) Conclusion

In urging affirmance of the Secretary, defendants repeatedly emphasize that the Court should sustain the Secretary's action because Congress, in enacting the IDCPA, chose to embrace and implement the Panama Declaration and thus change course from its previous approach to dolphin conservation, which featured embargoes and strict import restrictions. Changing the dolphin-safe label standard, the Secretary argues, is part of Congress' new approach and should not be impeded. Defendants, however, overstate the matter. While Congress certainly embraced most of the Panama Declaration, and in so doing made many changes with respect to embargo and trade restrictions, when it came to the issue of the dolphin safe label, Congress did not agree to simply change the label standards, as the Panama Declaration signatories, including the United States Administration, would have preferred. Rather, as discussed above, Congress ultimately rejected this approach and instead unanimously decided that, despite the low observed mortality rates, the decision whether to change the label standard should await scientific data from mandated studies on the stress effects, if any, that result from the use of purse seine nets. It is to this Congressional compromise that the Secretary must be held.

The Court is also mindful of the deference accorded agencies in addressing scientific matters within their expertise. It concludes, however, that in this instance, the Secretary acted contrary to the law and abused his discretion when he triggered a change in the dolphin safe label standard on the ground that he lacked sufficient evidence of significant adverse impacts. As discussed above, the Secretary's actions can not be reconciled with Congress' intent that the initial finding—and any resulting label change—would be informed by preliminary data from the mandated stress research projects. Indeed it would flout the statutory scheme to permit the Secretary to fail to conduct mandated research, and then invoke a lack of evidence as a justification for removing a form of protection for a depleted species, particularly given that the evidence presently available to the Secretary is all suggestive of a significant adverse impact.

Accordingly, and in light of all of the above, plaintiffs' motion for summary judgment with respect to their claim under the APA is GRANTED. The Secretary's initial finding shall be set aside until such time as the Secretary has an opportunity to consider preliminary results from the Congressionally mandated stress research studies.

### C. *NEPA CLAIM*

█ In addition to their primary APA claim, plaintiffs also contend that defendants failed to comply with their obligations under the NEPA, 42 U.S.C. § 4321 et seq. Notably, however, plaintiffs devote

barely over two pages of their motion to this issue, which is consistent with its brief mention in their First Amended Complaint.[21] Having considered the parties' arguments, however, the Court is satisfied that defendants are entitled to judgment on this claim as a matter of law.

As a general rule, NEPA is designed to ensure "that environmental concerns [are] integrated into the very process of agency decisionmaking. The 'detailed statement' it requires is the outward sign that environmental values and consequences have been considered during the planning stage of agency actions." *Andrus v. Sierra Club*, 442 U.S. 347, 350, 99 S.Ct. 2335, 2337, 60 L.Ed.2d 943 (1979). As such, NEPA only applies to "discretionary federal action." *Sierra Club v. Babbitt*, 65 F.3d 1502, 1512 (1995).

Here, Congress mandated that the Secretary conduct specifically defined research and make an initial finding based on scientific evidence adduced from this research and other sources. 16 U.S.C. §§ 1385(g)(1), 1414(a). Congress further mandated the specific policies and legal actions that would flow from such finding and gave the agency no discretion in this regard. 16 U.S.C. § 1385. While the Secretary was required to review the available evidence in making the finding, the Secretary had no discretion to make findings contrary to the results of that evidence. Accordingly, this Court concludes that the Secretary's initial finding was a non-discre-

tionary act for purposes of NEPA. Notably, plaintiffs are unable to cite this Court to any authority in which NEPA was applied to a scientific finding comparable to the finding required in the case at bar. Accordingly, Defendants' motion for summary judgement, with respect to Plaintiffs' NEPA claim is GRANTED.[22]

IT IS SO ORDERED.

---

21. NEPA is mentioned only once in plaintiffs' factual allegations, which allege that the Secretary's decision allowing the use of dolphin safe labels on products that were harvested using purse seine nets "constitutes a major federal action significantly affecting the quality of the human environment within the meaning of the [NEPA]. 42 U.S.C. § 4332. Nevertheless, plaintiffs are informed and believe that defendants never prepared an Environmental Assessment [EA] or Environmental Impact Statement [EIS] addressing the effects of this action on depleted dolphins in the fishery or other aspects of the environment." *See* FAC at ¶ 67, While these allegations, combined with plaintiffs' request for declaratory relief, are probably sufficient to state a claim

under the liberal pleading rule set forth in Fed.R.Civ.P. 8, and defendants have claimed no prejudice from plaintiffs' failure to explicitly plead a separate legal cause of action under NEPA, this lack of attention to the claim is telling.

22. Given the above, the Court does not reach the issues whether (1) the initial finding qualifies as a "major federal action" for purposes of NEPA, and (2) even if the initial finding did fall within the ambit of NEPA, defendants fulfilled their NEPA obligations by preparing an EA in connection with the January 2, 2000 interim final regulations implementing the IDCPA.